UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOSE S. MILLAN, | ) | 1:07-CV-01440 LJO JMD HC |
| | ) | |
| Petitioner, | ) | |
| | ) | FINDINGS AND RECOMMENDATION |
| v. | ) | REGARDING PETITION FOR WRIT OF |
| | ) | HABEAS CORPUS |
| A. HEDGPETH, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner Jose Millan ("Petitioner") is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation in accordance with a judgement of the Kern County Superior Court. (Answer at 2). On June 2, 2005, Petitioner was convicted by a jury of first degree murder (Cal. Penal Code § 187(a)), first degree attempted murder (Cal. Penal Code § 187/664, 189), and assault with a deadly weapon (Cal. Penal Code § 245(a)(2)). (Id.). Petitioner was sentenced to fifty years-to-life for the first degree murder conviction, two life terms for the attempted murder convictions, and seventeen years-to-life for the assault conviction. (Id).

Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District on October 7, 2005. (Id; Lod. Doc. 1). The appellate court affirmed Petitioner's conviction in an unpublished opinion issued on June 22, 2006. (Answer at 2; Lod. Doc. 2).

Petitioner subsequently submitted a petition for review to the California Supreme Court on July 18, 2006. (Lod. Doc. 3). The California Supreme Court summarily denied review on August

30, 2006.

On September 4, 2007, Petitioner filed this instant federal petition for habeas corpus relief in the Central District of California. The petition sets forth two grounds for relief, asserting violations of Petitioner's rights under the federal constitution and state law. Petitioner contends as his first ground for relief that his rights were violated by the trial court's exclusion of Petitioner's statement to the emergency room physician. The second ground for relief asserted by Petitioner is that the trial court's admission of a statement by Petitioner that "he had valor enough to kill himself with [his brother-in-law]" violated his rights.

On September 6, 2007, the petition was transferred to the Eastern District of California.

On December 5, 2007, Respondent filed an answer to the petition.

## FACTUAL BACKGROUND[1]

The events giving rise to this case occurred at a New Year's Eve party hosted by [Petitioner]'s brother-in-law, Jose Mendoza, at Jose's[2] trailer home in Lost Hills. A number of family members living in the same trailer park were invited, including Jose's sister and [Petitioner]'s wife, Magdalena Mendoza (victim of count 2). [Petitioner], Magdalena, and their children arrived at the party sometime between 8:00 and 9:00 p.m. on December 31, 2004. According to Magdalena, [Petitioner] was drinking tequila before the party around 6:30 or 7:00 p.m. and was drunk at midnight. During the party, guests danced and consumed food and alcohol. At midnight, Magdalena's brothers, Luis (victim of count 3) and Elfego (victim of count 4) shot guns in the air and then put the guns away.

Magdalena's brother-in-law Javier Vasquez had a conversation with [Petitioner] around 1:30 or 2:00 a.m. Vasquez testified that [Petitioner] asked him for advice because [Petitioner] was "feeling very badly" about "[p]roblems" with Magdalena. Vasquez then testified, over relevancy and hearsay objections, that [Petitioner] made a remark to him about Magdalena's brother Chon. [Petitioner] told Vasquez "that he had valor enough to kill himself with Chon, and that Chon was the eldest one and if Chon wanted to do it, he would do it.... Kill himself with Chon or something like that...." Vasquez testified that Chon had left the party around 10:30 or 11:00 p.m. When asked whether he had observed any problem between [Petitioner] and Chon, Vasquez responded, "Yes, they spoke very little. I think they only greeted each other."

Around 3:30 a.m., [Petitioner] was dancing with Magdalena when he told her he wanted to go home. Magdalena told [Petitioner] she did not want to go home because she was with her brothers and was having fun. [Petitioner] told Magdalena that she "was going to go." When she said "no," [Petitioner] pulled Magdalena by the hair and shirt, telling her "let's go." Magdalena testified she did not go with him

---

[1] The facts are derived from the factual summary set forth by the Fifth DCA in its unpublished opinion issued on February 27, 2006, and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).

[2] The first names of Mr. Mendoza and various family members are used for ease of reference only, not out of any disrespect.

because she was afraid he would beat her up once they got home. Rosalia, Luis's wife, approached and told defendant to leave Magdalena alone. [Petitioner] cursed at Magdalena and then left in his car. About 10 minutes after he left, [Petitioner] tried to call Magdalena on her minor son's cell phone. [Petitioner] said he wanted to speak with Magdalena, but when her son brought her the phone, she loudly said she did not want to talk to defendant because he had been treating her badly.

      Around 20 to 25 minutes after leaving the party, [Petitioner] returned with a shotgun. From his car, [Petitioner] kept "screaming" for Magdalena to come to him. Magdalena and others went inside the bedroom in Jose's trailer. [Petitioner] got out of his car and cocked the gun. He asked where Magdalena was. One of the children said she was in the trailer. Magdalena's minor niece ran into the trailer, warning the others that [Petitioner] had a gun. [Petitioner] followed her into the trailer, and shot through the bedroom door, striking Elfego in the shoulder. Elfego was treated at the hospital. At the time of trial, shotgun pellets remained in Elfego's shoulder and he had difficultly moving his arm and experienced pain when he lifted it.

      After shooting the bedroom door, [Petitioner] walked back outside the trailer. Francisco Martinez (victim of count 1), a family friend, tried to talk to [Petitioner] and get him to calm down. Martinez's wife, Yesenia, grabbed Martinez by the arm and told him not to interfere. [Petitioner] raised his gun and shot Martinez in the head from a distance of two to three feet. Martinez died a few seconds later in his wife's arms. According to Luis, before [Petitioner] shot Martinez, [Petitioner] said, " 'You fucked me up now.' " However, other witnesses did not hear [Petitioner] say anything.

      After [Petitioner] shot Martinez, [Petitioner] cocked the gun again. Vasquez yelled at [Petitioner] to "pull his weapon down" and not to shoot anymore. [Petitioner] looked at Vasquez "really ugly, like he wanted to shoot [Vasquez]." Vasquez stood up from his chair and told [Petitioner] to calm down and not to shoot him. [Petitioner] kept looking at Vasquez. [Petitioner] had his finger in the trigger. Vasquez ducked and heard a loud shot. [Petitioner] shot a hole through the hood of the sweatshirt Vasquez was wearing.

      [Petitioner] then turned his gun on Luis and said, " 'There's going to be some for you also.' " Luis, who was initially seated, tried to hide behind a chair. [Petitioner] fired two shots at him. One shot struck Luis in the left side of his face and blew off part of his lower jaw. As a result of the shooting, Luis suffered hearing and vision loss and lost most of his teeth. Luis was hospitalized for two months. He underwent two skin graft operations and had a piece of bone taken from his leg and put into his jaw. Five months after the shooting, at the time of trial, he was still unable to work. Luis testified that he and [Petitioner] had previously been best friends and worked together. Luis did not know why [Petitioner] shot him in the face.

      After [Petitioner] shot Luis, he went back into the trailer and walked to the bedroom where Magdalena was hiding. Jose, who was hiding under the kitchen table, heard [Petitioner] yell for Magdalena to come out, saying he wanted to kill her. When defendant entered the bedroom, he aimed the gun at Magdalena and fired it. Magdalena crouched down. The shot broke the dresser mirror. [Petitioner] was then subdued by Magdalena's brothers and detained until police arrived.

      Kern County Sheriff's Detective Gilbert Valdez inspected [Petitioner]'s gun. He determined it would hold six shotgun shell rounds: "five in the feeding tube and one in the chamber." The gun required a pump action to refill the chamber with a round each time it was fired.

***The defense***

      [Petitioner] did not testify. In his appellate brief, [Petitioner] cites, in his summary of the defense's case, testimony of prosecution witnesses describing his apparent intoxication on the night of the shootings.

      The defense called Darrel Feaster, an ambulance driver who helped transport [Petitioner] to the hospital after the shootings. He arrived at the scene around 5:20

a.m. According to Feaster, [Petitioner] seemed to have "a little bit of an altered mental status or an altered state" but he could not judge whether [Petitioner] was intoxicated.

    Dr. Eugene Couture, a clinical neuropsychologist, examined [Petitioner] on March 29 and April 29, 2005. Dr. Couture performed a battery of tests which revealed [Petitioner] had impairments consistent with alcohol dependency. Two findings were consistent with alcohol dependency. The first was [Petitioner]'s history. He began drinking at the age of 15 and when he drank, he drank to intoxication. The other finding was that his intoxication had "brought consequences into his life" including several arrests for driving under the influence and spousal abuse having to do with intoxication. Dr. Couture opined: "So what we're seeing is a pattern of a man who's been drinking since he was a teenager, and he drinks to excess very regularly and because of that drinking he gets into trouble, and that's the pattern you see with long-term alcohol dependence."

    From tests of [Petitioner]'s cognitive skills and abilities, Dr. Couture determined that [Petitioner] had the beginnings of alcohol-induced psychosis. Dr. Couture defined psychosis as "when your thinking is so disordered that you see things that aren't there, that you hear things that aren't there, that you have beliefs, called delusions, that things are true when they're simply not true." Tests also revealed that, though his memory was good, [Petitioner] had depressed intellectual functioning and problems with executive functioning.

    Dr. Couture explained that a diagnosis of chronic alcohol dependence requires an increased tolerance to alcohol, which means the alcohol-dependent person can have a couple drinks and not even feel it and it starts taking an increasing amount to feel the effects. Someone who is alcohol dependent also develops what is called "state-dependent learning." This means they learn how to appear relatively sober after consuming an amount of alcohol which would make an ordinary person appear intoxicated. Thus, an alcohol-dependent person who actually looks drunk would be expected to have a very high level of alcohol in their system. Moreover, it is well known that alcohol reduces impulse control. If someone has a preexisting problem with their executive functioning, adding alcohol will make the person even more impaired.

    Sheriff Detective Michael Bonsness testified that on January 1, 2005, he was called out to the Lost Hills area to investigate a homicide. There, he spoke to Magdalena in English and used a translator. Magdalena never said that [Petitioner] took a shot at her. Sheriff Deputy Jesus Hernandez, who was also involved in the January 1st investigation, spoke with Jose. Jose told Deputy Hernandez that the first time [Petitioner] came into the trailer he fired a shot at the bedroom door. Then, seeing a window was open, [Petitioner] fired at the open window. When [Petitioner] came back into the trailer a second time, Jose and his nephew jumped on [Petitioner] and took the gun away from him. On direct, Deputy Hernandez testified he could not remember Jose saying that [Petitioner] shot at Magdalena. However, on cross-examination, after being refreshed by his report, the deputy recalled that Jose told him that [Petitioner] came back in the house and shot at Magdalena.

(Lod. Doc. 2 at 2-7)

## DISCUSSION

**I.**    **Jurisdiction**

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529

1  U.S. 362, 375 n.7 (2000). A habeas "application may be filed in the district court for the district
2  wherein such person is in custody or in the district court for the district within which the State court
3  was held which convicted and sentenced him." 28 U.S.C. § 2241(d). Petitioner asserts that he
4  suffered violations of his rights as guaranteed by the U.S. Constitution. Petitioner's custody arises
5  from a conviction in the Kern County Superior Court and Petitioner is currently incarcerated at
6  California State Prison, Corcoran in Kings County. As the Eastern District of California includes
7  both Kern and Kings County, this court has jurisdiction over the instant action. *See* 28 U.S.C. §
8  84(b).

9  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of
10 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's
11 enactment. Lindh v. Murphy, 521 U.S. 320, 326-327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499
12 (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97
13 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by*
14 Lindh, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)). The
15 instant petition was filed on August 10, 2005 and is consequently governed by the provisions of the
16 AEDPA, which became effective April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003).

17 **II.      Legal Standard of Review**

18        This Court may entertain a petition for a writ of habeas corpus by "a person in custody
19 pursuant to the judgment of a state court only on the ground that he is in custody in violation of the
20 Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

21        Since Petitioner filed his petition after the effective date of AEDPA, his petition for habeas
22 corpus "may be granted only if he demonstrates that the state court decision denying relief was
23 "contrary to, or involved an unreasonable application of, clearly established Federal law, as
24 determined by the Supreme Court of the United States."" Irons v. Carey, 505 F.3d 846, 850 (9th Cir.
25 2007) (quoting 28 U.S.C. § 2254(d)(1)); *see* Lockyer, 538 U.S. at 70-71.

26        As a threshold matter, this Court must "first decide what constitutes 'clearly established
27 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71
28 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this

1  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of
2  the time of the relevant state-court decision." Id. (quoting Williams, 592 U.S. at 412). "In other
3  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or
4  principles set forth by the Supreme Court at the time the state court renders its decision." Id.

5        Finally, this Court must consider whether the state court's decision was "contrary to, or
6  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,
7  (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant
8  the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
9  question of law or if the state court decides a case differently than [the] Court has on a set of
10 materially indistinguishable facts." Williams, 529 U.S. at 413; *see also* Lockyer, 538 U.S. at 72.
11 "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court
12 identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies
13 that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may
14 not issue the writ simply because the court concludes in its independent judgment that the relevant
15 state court decision applied clearly established federal law erroneously or incorrectly. Rather, that
16 application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable
17 application" inquiry should ask whether the state court's application of clearly established federal law
18 was "objectively unreasonable." Id. at 409.

19       Petitioner bears the burden of establishing that the state court's decision is contrary to or
20 involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle,
21 94 F.3d 1321, 1325 (9th Cir.1996).  Although only Supreme Court law is binding on the states, Ninth
22 Circuit precedent remains relevant persuasive authority in determining whether a state court decision
23 is objectively unreasonable.  *See* Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003); Duhaime v.
24 Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

25       AEDPA requires considerable deference to state court decisions. The state court's factual
26 findings are presumed correct. 28 U.S.C. § 2254(e)(1).  Furthermore, this court is bound by a state's
27 interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*,
28 537 U.S. 859, 123 S.Ct. 231 (2002), *rehearing denied*, 537 U.S. 1149, 123 S.Ct. 955 (2003).

**III.    Review of Petitioner's Claim**

    **A.    Ground One**

As his first ground for relief, Petitioner asserts that the trial court's exclusion of his statement to the treating physician that he did not know why he shot the victims constituted a violation of his rights to present a complete defense and to due process of the law, as guaranteed by the Sixth and Fourteenth Amendments. This claim was presented in an appeal to the California Court of Appeal, which rejected the claim in the last reasoned opinion in this case. (Lod. Doc. 2 at 9). Petitioner raised the same issues in an application for review to the California Supreme Court. (Lod. Doc. 3 at 4-12). The California Supreme Court denied the petition without comment on August 30, 2006. (Id. at 22). By its "silent order" denying the petition, the state supreme court is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); *also* Pham v. Terhune, 400 F.3d 740, 742 (9th Cir. 2005) (stating, "[i]n reviewing a state court's summary denial of a habeas petition, this court must 'look through' the summary disposition to the last reasoned decision").

A defendant has a clearly established federal constitutional right to present a complete defense. Crane v. Kentucky, 476 U.S. 683, 690 (1986)(stating that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense"). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294 (1973); *accord* Davis v. Alaska, 415 U.S. 308, 317 (1974); Washington v. Texas, 388 U.S. 14, 19 (1967). The erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense. DePetris v. Kyukendall, 239 F.3d 1057, 1062 (9th Cir. 2001)(citing Chambers, 410 U.S. at 294 and Washington, 388 U.S. at 18-19 in holding that exclusion of victim's journal was prejudicial error under the Brecht standard).

"However, '[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions,' such as evidentiary and procedural rules." Moses v. Payne, No. 07-35468, 2008 WL 4192031, at *10 (9th Cir. Sept. 15, 2008)(citing United States v. Scheffer, 523

U.S. 303, 308 (1998)).  The Ninth Circuit has "traditionally applied a balancing test to determine whether the exclusion of evidence in the trial court violated petitioner's due process rights, weighing the importance of the evidence against the state's interest in exclusion." Chia v. Cambra, 360 F.3d 997, 1003 (9th Cir. 2004)(citing Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985), *amended on other grounds*, 768 F.2d 1090 (9th Cir. 1985)).  The factors, as set forth in Chia, to be considered in balancing these interests are: (1) the probative value of the excluded evidence to the central issue; (2) the reliability of the excluded evidence; (3) whether the excluded evidence is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether the excluded evidence constitutes a major part of the attempted defense.  Id. at 1004. Additionally, upon a finding of constitutional error, a federal court may grant an application for habeas relief regarding a state evidentiary error only where the petitioner establishes that the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quotation marks omitted).

Here, the trial court found no relevance in the testimony of the physician that she inquired about why Petitioner shot the victims and he responded that he did not know.  Petitioner asserts the statement is "powerful evidence that he had not harbored premeditation or even malice." (Pet. at 13-14).  The appellate court concluded that Petitioner's right to present a complete defense had not been violated by the trial court's exclusion of this statement. (Lod. Doc. 2 at 9).  As noted by the appellate court, the jury heard substantial evidence supporting Petitioner's theory that his mental condition and intoxication did not allow him to form the requisite intent required for a conviction of first degree murder and attempted murder. (Lod. Doc. 2 at 9).  Specifically, the appellate court stated that:

> Here, the court did not preclude defendant from presenting a defense that his intoxication prevented from forming the requisite specific intent and negated the elements of deliberation and premeditation for the first degree and attempted first degree murder charges.  The jury heard expert testimony regarding defendant's impaired mental capacity due to chronic alcohol abuse as well as evidence, from both prosecution and defense witnesses, of his intoxication on the night of the incident. They also heard evidence of the absence of the motive on defendant's part for harming the victims, including evidence he and Luis had been best friends and Francisco was simply a family friend who was trying to diffuse the situation. Defendant's statement that he did not know why he shot the victims was consistent with this and other evidence supporting defendant's theory that he had no motive for killing any of the victims but rather was deranged by alcohol when he started his shooting spree.

(Id).

As further evidenced by his counsel's closing argument, Petitioner's ability to present the defense that he did not possess the requisite mental state to convict for first degree murder was not hampered by the exclusion of Petitioner's statement. (*See* RT at 997-1009). Petitioner's counsel noted the evidence did not show that Petitioner possessed the intent required for a first degree murder and attempted murder conviction due to his intoxication, alcohol abuse, and lack of motivation for harming the victims. Petitioner himself noted that circumstantial evidence supporting this particular defense was admitted. (Pet. at 18-19). Thus, the statement was neither the sole evidence on the issue of Petitioner's mental state nor did it constitute a major part of the attempted defense of lack of intent.

Furthermore, it is not clear that Petitioner's statement that he did not know why he killed the victims would have substantially bolstered Petitioner's defense. *Compare* Chia, 360 F.3d at 1003 (holding that state court's exclusion of exculpatory hearsay statements was unreasonable application of clearly establish federal law as the statements were reliable, material, and would have substantially bolstered defendant's claim of innocence); *also* DePretris, 239 F.3d at 1062-1063 (holding that excluding victim's journal in which the victim detailed committing numerous violent acts and not permitting defendant to testify about how her state of mind resulted from having read the journal entries went to the heart of defendant's claim of self-defense). Unlike the evidence excluded in Chia and DePretris, the probative value of this statement to the central issue–whether Petitioner possessed the requisite mental state for first degree murder and attempted murder–is somewhat tenuous. The statement that he did not know why he killed the victims is ambiguous as to the issue of intent. It could be interpreted as demonstrating that Petitioner did not intend to kill the victims but could also demonstrate that he did not understand his motivations for doing so. Additionally, the reliability of this statement, made by Petitioner hours after he was taken by police from the scene of the crime, is questionable. Considering the factors enumerated in Chia, it is clear that the appellate court's conclusion, that the exclusion of Petitioner's statement neither denied Petitioner a meaningful chance to present a complete defense nor his right to due process, was not an objectively unreasonable application of clearly established federal law.

Having found no constitutional error, the appellate court applied the standard articulated by the state supreme court in People v. Watson, 46 Cal.2d 818, 836 (1956), to examine whether the trial court's alleged error under state law grounds prejudicially impacted Petitioner. (Lod. Doc. 2 at 9-10). Under Watson, a reversal is warranted when "it is reasonably probable that a result more favorable to [Petitioner] would been reached in the absence of the error." Watson, 46 Cal.2d at 836. The Ninth Circuit has previously recognized the Watson standard as essentially the same test as the federal standard set forth in Brecht. *See* Henry v. Estelle, 33 F.3d 1037, 1041-1042 (1993), *rev'd sub nom on other grounds*, Duncan v. Henry, 513 U.S. 364 (1995)(per curiam); Bains v. Cambra, 204 F.3d 964, 971 n. 2 (9th Cir. 2000). The Brecht standard similarly requires that an error is not harmless where it "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623 (quoting Kotteakos v. United States, 328 U.S. 7450, 776 (1946)). The appellate court thus concluded that even if the trial court erred in excluding the statement, there was not a reasonable probability that the admission of the statement would have lead the Petitioner to achieve a more favorable result. (Lod. Doc. 2 at 10). As noted by the appellate court, the ample evidence showing Petitioner possessed an intent to kill the victims and that his actions were deliberate and premeditated compelled such a finding.

In finding that there exists no constitutional error, this Court cannot grant a habeas petition for alleged errors of state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)(stating, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions"). Furthermore, "federal habeas corpus relief does not lie for error in state law." Id. at 67 (citing Lewis v. Jeffers, 497 U.S. 764, 780 (1990) and Pulley v. Harris, 465 U.S. 37, 41 (1984)). In sum, Petitioner's claims regarding the exclusion of his statement cannot serve as a viable basis for habeas corpus relief.

**B.    Ground Two**

The petition's second ground for relief alleges that the introduction of the statement, "[t]hat he had valor enough to kill himself with [his brother-in-law]," violated his right under both the Due Process Clause of the federal constitution and state law as the statement constitutes inadmissable propensity evidence. (Pet. at 24). These claims were presented in an appeal of Petitioner's

conviction before the California Court of Appeal.  The appellate court rejected this claim as procedurally barred, finding that Petitioner had waived the claim by not presenting the same objections to the trial court.  (Lod. Doc. 2 at 11).  The appellate court concluded that even had the issue not been waived by Petitioner, the claim failed as the statement was admissible under state law.  Petitioner raised the same issues in an application for review to the California Supreme Court.  (Lod. Doc. 3 at 13-19).  The state supreme court denied the petition without comment on August 30, 2006.  (Id. at 22).  By its "silent order" denying the petition, the California Supreme Court is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court.  Ylst, 501 U.S. at 803.

      A federal court will not review claims in a petition for writ of habeas corpus if the state court has denied relief on those claims on a state law ground that is independent of federal law and adequate to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  This doctrine of procedural default is based on the concerns of comity and federalism.  Id. at 730-32.  There are limitations as to when a federal court should invoke procedural default and refuse to evaluate the merits of a claim because the petitioner violated a state's procedural rules.  Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263 (1989).

      In addition, the state law ground must be independent of federal law.  "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law."  LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001)(citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996)(quoting Coleman, 501 U.S. at 735 that, "[f]ederal habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be interwoven with federal law.'")  "A state law is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'" Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000)(quoting Ake v. Oklahoma, 470 U.S. 68, 75 (1985)).

      Furthermore, a federal court may only impose a procedural bar on claims if the procedural rule that the state used is adequate to support the judgment.  To be adequate, "the state's legal

grounds for its decision must be firmly established and consistently applied." King v. LaMarque, 464 F.3d 963, 965 (9th Cir. 2006) (citing Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003)). To be firmly established and consistently applied, the rule must be clear and certain. King, 464 F.3d at 965-966 (citing Melendez v. Pliler, 288 F.3d 1120, 1124 (9th Cir. 2002)); see also Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997) (The state procedural rule used must be clear, consistently applied, and well-established at the time of the petitioner's purported default).

The question of whether the state procedural bar is independent and adequate is examined in light of the burden shifting rule the Ninth Circuit outline in Bennett, stating that:

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state's.

Bennett, 322 F.3d at 586.

Where the court finds an independent and adequate state procedural ground exists, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park, 202 F.3d at 1150.

In order to establish cause for a procedural default, Petitioner must " 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.' " Coleman, 501 U.S. at 753 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). The United States Supreme Court has not adopted a precise definition of what constitutes "cause." See Edwards v. Carpenter, 529 U.S. 446, 451 (2000). The Supreme Court has, however, identified at least three instances that may constitute cause: 1) the factual or legal basis of the claim was not available to the petitioner; 2) some interference by state officials made the petitioner's compliance impracticable; and 3) the default was the result of the ineffective assistance of counsel. See Murray, 477 U.S. at 488. To establish prejudice, the petition bears the burden of establishing that the errors claimed of "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 494 (citation omitted). Although the Supreme Court has not

1 provided content for the term prejudice, the Court has noted that the standard is "significantly
2 greater" than the showing necessary to establish plain error on direct appeal. Id. At 493-494; *see*
3 United States v. Frady, 456 U.S. 152, 168 (1982). Lastly, a federal habeas court may also excuse a
4 petitioner's procedural default where a fundamental miscarriage of justice would result. *See* Murray,
5 477 U.S. at 496. To establish a fundamental miscarriage of justice Petitioner must show that "a
6 constitutional violation has probably resulted in the conviction of one who is actually innocent." Id.

7       The appellate court's adjudication of Petitioner's claim was based upon an independent state
8 ground, specifically that, "[t]he People counter that defendant waives his section 1101 objection by
9 failing to raise it in the trial court...We agree with the People that defendant waived his claim that his
10 statement was inadmissible character evidence because he did not object below on the ground.
11 (*People v. Thomas* (1992) 2 Cal.4th 489, 520; § 353)." (Lod. Doc. 2 at 11). At question here is
12 California's requirement that the defendant make a contemporaneous objection at trial in order to
13 preserve the issue at appeal. *See* Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) (noting
14 that under California Evidence Code section 353, "known as the 'contemporaneous objection rule,'
15 evidence is admissible unless there is an objection, the grounds for the objection are clearly
16 expressed, and the objection is made at the time the evidence is introduced"). California's
17 contemporaneous objection rule is applied independently of federal law. *See* Vansickel v. White,
18 166 F.3d 953, 957 (9th Cir. 1999)(recognizing and applying California's contemporaneous objection
19 rule in affirming denial of a federal petition on the ground of procedural default); Bonin v. Calderon,
20 59 F.3d 815, 842 (9th Cir. 1995)(sustaining state court's finding of procedural default where
21 defendant failed to make any objection at trial). Additionally, California courts have consistently
22 applied the contemporaneous objection rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir.
23 2002) (citing Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981)); Vansickel, 166 F.3d at 957;
24 Bonin, 59 F.3d at 842 (sustaining state court's finding of procedural default where defendant failed to
25 make any objection at trial).

26       Petitioner has not offered any explanation for his failure to raise this issue at trial.
27 Furthermore, this Court does not find that prejudice resulted from the admission of Petitioner's
28 statement "[t]hat he had valor enough to kill himself with [his brother-in-law]." While Petitioner

argues that the statement was prejudicial evidence that he had a propensity for violence, the jury's finding that Petitioner committed the crimes with intent and premeditation is supported by overwhelming evidence–specifically, as noted by the appellate court, Petitioner shot two victims at close range in their face/head, he made threatening comments to at least two victims before firing at them, and the weapon Petitioner used required a pump action to refill the chamber with a round each time it was fired.  (*See* Lod. Doc. 2 at 4-5).  Consequently, Petitioner has failed to demonstrate that there is a sufficient cause for his failure to raise the issue nor that prejudice resulted from the exclusion of his statement.  *See* Davis v. Woodford, 384 F.3d 628, 654 (9th Cir. 2004)(citing Wainwright v. Sykes, 433 U.S. 72, 90-91 (1977).  Lastly, Petitioner cannot establish a fundamental miscarriage of justice would result if the court does not excuse his procedural default as he does not claim actual innocence of the crime.

Even assuming *arguendo* that Petitioner's claim was not procedurally barred or that Petitioner established cause and prejudice as to permit federal habeas review, Petitioner fails to state a cognizable federal habeas claim.  This Court's review is limited to determining whether the state court unreasonably applied clearly established Supreme Court law.  28 U.S.C. § 2254(d)(1); Delgado v. Lewis, 223 F.3d at 979-80.  The Supreme Court has expressly reserved the question of whether a trial court's admission of propensity evidence may violate the Due Process Clause.  Alberni v. McDaniel, 458 F.3d 860, 863-867 (9th Cir. 2006) *cert denied*, U.S. , 127 S.Ct. 1834 (2007) (citing Estelle, 502 U.S. at 75 N. 5.  Consequently, a state court's conclusion, that the admission of propensity evidence does not violate a defendant's right to due process, is neither contrary to nor an unreasonable application of clearly established Federal law.  Id. at 866-67; Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008).

## RECOMMENDATION

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O' Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule

1  72-304 of the Local Rules of Practice for the United States District Court, Eastern District of
2  California. Within thirty (30) days after being served with a copy, any party may file written
3  objections with the court and serve a copy on all parties. Such a document should be captioned
4  "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall
5  be served and filed within ten (10) court days (plus three days if served by mail) after service of the
6  objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §
7  636(b)(1)(c). The parties are advised that failure to file objections within the specified time may
8  waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:     October 31, 2008                    /s/ John M. Dixon
                                        UNITED STATES MAGISTRATE JUDGE